UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 08-23197-CIV-GOLD/MCALILEY

REGINA HILLS,

     Plaintiff,

v.

WAL-MART STORES, INC.,

     Defendant.

_____/

### SECOND AMENDED[1] ORDER GRANTING DEFENDANT WAL-MART STORES, INC.'S MOTION FOR SUMMARY JUDGMENT; CLOSING CASE

THIS CAUSE is before the Court upon Defendant Wal-Mart Stores, Inc.'s ("Walmart") Motion for Summary Judgment **[DE 51]**, filed on December 8, 2009.  In her Complaint, Plaintiff alleges violations of The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.,* and the Florida Civil Rights Act of 1992*,* Fla. Stat. § 760.01 *et seq*. Plaintiff Regina Hills ("Plaintiff") filed a Response to Walmart's Motion **[DE 70]** on January 19, 2010, and Walmart filed a Reply **[DE 88]** on February 9, 2010.  Oral argument on the Motion was held on April 23, 2010.  I have reviewed the pleadings filed by the parties, the record and the applicable law. For the reasons set forth below, Defendant's Motion is granted.

---

[1] This amended order is issued to correct a typographical error, [See section IV, Conclusion].

1

I.   **Background**[2]

Having reviewed Walmart's Statement of Undisputed Facts, the Plaintiff's response, and the evidentiary materials offered by both sides, the following facts relevant to the disposition of Walmart's Motion are undisputed:

On March 24, 2004, Plaintiff was hired by Walmart as a cashier.[3]  (Pl. Statement, ¶ 1).  Although Plaintiff generally received positive performance reviews and received pay rate increases during her employment with Walmart, at times, Plaintiff's attendance was poor.  (Def. Statement ¶ II.B.1).   For instance, on Plaintiff's performance appraisal dated June 21, 2004, Plaintiff received a below expectations rating in the area of dependability, and the performance appraisal indicated that Plaintiff "need[ed] to improve call-in."[4]  *(Id.,* ¶ II.B.2).

On July 18, 2006, Plaintiff was working in the stationery department when Ms.

_____

[2]

In the Southern District of Florida, a party moving for summary judgment must submit a statement of undisputed facts.  S.D. Fla. L.R. 7.5.  If necessary, the non-moving party may file a concise statement of the material facts as to which it is contended there exists a genuine issue to be tried.  *Id.*  Each disputed and undisputed fact must be supported by specific evidence in the record, such as depositions, answers to interrogatories, admissions, and affidavits on file with the Court.  *Id.*  All facts set forth in the movant's statement which are supported by evidence in the record are deemed admitted unless controverted by the non-moving party.  *Id.* Defendant filed a Statement of Undisputed Facts [DE 52] ("Def. Statement"), Plaintiff has filed its  Statement of Material Facts in Opposition to Defendant's Statement [DE 67] ("Pl. Statement").

[3]

When Plaintiff was hired in 2004, she was pregnant with her seventh child, who was born in July 2004 during her employment with Walmart.  (Def. Statement, ¶ 3).

[4]

Walmart's Attendance Policy states that associates are required to report all absences and tardies by calling Walmart's automated hotline at least one hour prior to their scheduled start time.  (Def. Statement, ¶ II.A.1).

Mona Lewis ("Lewis"), a Customer Service Manager, and an unidentified off-duty police officer entered the department. (*Id.*, ¶ IV.A.1). According to Plaintiff, Lewis and the officer were speaking and laughing, and she overheard Lewis say to the police officer, "Yeah, that's the one, that's the one." (*Id.*). At the time, Plaintiff believed that Lewis and the off-duty police officer were speaking about her and "picking" on her. (*Id.*). After Lewis and the officer left the area, an unidentified co-worker advised Plaintiff that she believed Lewis "likes to pick a lot." (*Id.*, ¶ IV.A.2). Plaintiff told the co-worker that she would use Walmart's Open Door Policy to report Lewis if she "picked on her again."[5] (*Id.*). Thereafter, it appears that the unidentified co-worker reported Plaintiff's statement to Lewis, and, as a result Lewis returned to the stationery department and while looking around stated "Hm, this is the wrong time for this nigger to try me." (*Id.*, ¶ IV.A.3). Plaintiff claims she followed Lewis as she walked away from the stationary department and asked her, "Did you just call me a nigger?" (*Id.*, ¶ IV.A.3). According to Plaintiff, Lewis replied, "Excuse me, sweetie. Yes, I did." (*Id.*, ¶ IV.A.4). This was the only time that Plaintiff ever heard Lewis use the "N-word." (*Id.*, ¶ IV.A.4). Indeed, Plaintiff testified that it was the only time that Lewis made a comment that related to her race.[6] (*Id.*).

---

[5]

Pursuant Walmart's Open Door Policy, an Associate may speak with any level of Management to discuss any issue. (Def. Statement, ¶ III.A.6).

[6]

In support of her racial harassment claim Plaintiff further testified to the following with regard to Lewis: Prior to the July 18, 2006 incident, while Plaintiff was returning merchandise to its appropriate location, Lewis, after asking her to return to her register once the customer lines increased, clapped her hands at Plaintiff and said, "Hey, hey, hey, hey. What did I tell you? You see the line. Look, you're not paying attention to what I told you." Plaintiff admits, however, that she has no idea whether Ms. Lewis' conduct in clapping her hands and calling her "hey" on this one occasion is in any way related to her race. (Def. Statement, ¶ IV.B.1(d)). On another occasion before July 2006, Lewis allegedly

On that same day – July 18, 2006 – Plaintiff met with Manager Mr. Borchelt and Assistant Manager Jose Acevedo ("Mr. Acevedo") and advised them of Lewis's alleged use of the "N-word" earlier that day. (*Id.*, ¶ IV.A.7).  Mr. Borchelt assured Plaintiff that her superiors would address the situation and further reminded Plaintiff that Walmart's Open Door Policy precluded her superiors from discussing how they handle the situation with her.[7]  (*Id.*).  He then urged Plaintiff to report any subsequent inappropriate comments or conduct.  (*Id.*, ¶ IV.A.8).  Sometime thereafter, Plaintiff made it known that she would not work with Lewis any longer.  (*Id.*, ¶ IV.A.9).  Lewis informed Plaintiff that she was a cashier, and her refusal to work as a cashier could and would subject her to termination. (*Id.*). In response, Plaintiff informed Lewis that she would use the Open Door Policy to communicate Lewis' comment to Mr. Acevedo.  (*Id.*).  Plaintiff then called Mr. Acevedo; when he came to the front of the Store, Plaintiff advised that she did not feel comfortable working with Lewis any longer.  (*Id.*, ¶ IV.A.10).  Mr. Acevedo immediately assigned Plaintiff to return to work in the Stationery Department, so she would no longer have to work with Lewis.[8] (*Id.*).

---

removed a sticker that Plaintiff placed on Lewis's daughter's hand and then wiped her daughter's hand where the sticker had been placed. (*Id.*, ¶IV.B.1.(e)).  Plaintiff testified at her deposition that she never asked Lewis why she wiped her daughter's hand, but stated that it was her subjective belief that Ms. Lewis' conduct on that day was related to her race. (*Id.*)

[7]

Plaintiff does not know what action, if any, Walmart took in response to her complaint against Lewis. (Def. Statement, ¶ IV.A.13)

[8]

Although Ms. Lewis sometimes walked through the Stationery Department and looked around after Plaintiff began working there, she never spoke with Plaintiff again. (Def. Statement, ¶ IV.A.11).  Indeed, once Plaintiff complained about Lewis, Lewis never made any racially related remark again. (*Id.*).

By January 2007, Plaintiff had continued to be absent and tardy to work, and on January 2, 2007, Assistant Manager Bambi Robinson ("Robinson") issued Plaintiff a Written Coaching for Improvement because of her poor attendance and punctuality.[9] (*Id.*, ¶ II.B.5).  Specifically, as of that time Plaintiff had "14 absences/tardies in the last 30 days." (*Id.*).  Plaintiff acknowledged the Coaching for Improvement and apologized for the absences. (*Id.*).  Shortly thereafter, on February 17, 2007, Robinson issued Plaintiff's Annual Performance Appraisal in which her attendance was identified as an "Area for Improvement." (*Id.*, ¶ II.B.6).  Plaintiff was also given an overall performance rating of "below expectations" and again received a "below expectations" rating in the dependability category, having been absent 29 times and tardy 32 times during the year being reviewed. (*Id.*, ¶ II.B.6).  Plaintiff apologized once more for her attendance deficiencies, and again promised to improve her attendance.[10] (*Id.*).  Nevertheless, Plaintiff's attendance did not improve and in a letter dated March 23, 2007 Store Manager Pedro Rodriguez ("Mr. Rodriguez") advised Plaintiff of the following:  (1) Plaintiff had missed more than three days of work; (2) Associates who miss three or more days of work must be on an approved leave of absence, and she was not; and (3) urging her to take the necessary steps to address the issue.  (*Id.*, ¶ II.B.8).  Plaintiff did not respond to the letter, and Mr. Rodriguez

---

[9]

Walmart's Coaching for Improvement Policy is designed to inform an Associate when he or she is not meeting the requirements and expectations of his or her position. (Def. Statement, ¶ II.A.3).

[10]

Plaintiff acknowledges that, pursuant to Walmart's Attendance and Punctuality Policy, her employment could have been terminated when Robinson coached her on January 2, 2007, and when Ms. Robinson issued Plaintiff's Performance Appraisal on February 17, 2007, but Ms. Robinson made the decision not to terminate Plaintiff. (Def. Statement, ¶ II.B.7).

submitted a follow-up letter shortly thereafter. (*Id*.).

On April 29 or 30, 2007, Plaintiff experienced some vaginal bleeding while at work, and she went to the hospital. (*Id*., ¶ III.A.1).  While at the hospital, Plaintiff learned that she was pregnant and was "threatening a miscarriage," and, therefore, her doctors gave her documentation indicating that she must have "at least seven days of bed rest."  (*Id*.).  Plaintiff claims that she notified her superiors of her pregnancy, including Assistant Manager Robinson, and presented them the discharge documents from the hospital. (*Id*., ¶ III.A.2).   According to Plaintiff, Robinson refused to look at the documents.[11] (*Id*.).

Subsequently, Plaintiff returned to work on May 3, 2007, and she then worked more than two weeks before showing up over 4 ½ hours late to work on May 19, 2007.  (*Id*., ¶ III.A.5).  On that day, Plaintiff was scheduled to work from 10:00 p.m. to 7:00 a.m.   (*Id*., ¶ III.B.3).  However, she arrived at work after having missed more than fifty percent of her scheduled work shift, i.e., at 2:46 a.m. (Id.)   Plaintiff attempted to swipe her Associate badge; however, she was unable to do so because she had already missed more than half of her scheduled work shift and had accumulated an absence occurrence.[12] (*Id*., ¶ III.A.4).  Plaintiff then approached Robinson, and requested that Robinson perform a system

---

[11]

Plaintiff's superiors deny having any knowledge of her April 2007 pregnancy or need for bed rest as a result of her pregnancy at any time during her employment with Walmart. (Def. Statement, ¶ III.A.4).  Nevertheless, for purposes of Defendant's Motion for Summary Judgment, I will assume that Plaintiff provided such notice when she claims to have done so.

[12]

Walmart's automated time clock is programmed to preclude an associate from clocking in when he/she is not scheduled to be on the clock and/or if the Associate has missed more than fifty percent of his or her scheduled work shift. (Def. Statement, ¶ III.B.1)  If an Associate attempts to clock in late or early for his/her shift, the time clock system will not let him/her clock in to work. (*Id*.).

override and allow her to clock-in for her scheduled work shift.  (*Id.*, ¶ III.A.5).  Consistent with Walmart's Attendance and Punctuality Policy, Robinson refused to override the time clock.  (*Id.*).  Robinson also told Plaintiff at that time that her employment was terminated, and further advised Plaintiff that if she had a problem with her termination, she should use the Open Door Policy to discuss her termination with the Store Manager.  (*Id.*).

Plaintiff remained at the store until Store Manager Mr. Rodriguez arrived, and then used the Open Door Policy to discuss her termination with him.[13]  (*Id.*, ¶ III.B.7).   After a discussion with Plaintiff, Mr. Rodriguez reversed Plaintiff's termination; asked Plaintiff to return to speak with him; informed Plaintiff that she may return to work on her next scheduled shift; and told her Robinson could see him if she had a problem with his decision to allow her to return.  (*Id.*).  When Plaintiff indicated that she did not want to work her next scheduled shift because she needed to attend to some personal issues in Miami, he agreed to allow her to return back to work on her following scheduled shift, the next Thursday.  (*Id.*).  Plaintiff testified at her deposition that she did not return to work or speak with Mr. Rodriguez after May 19, 2007 because she decided to pursue a discrimination claim instead, and she did not want to "jeopardize" her EEOC claim. (*Id.*, ¶ III.B.8).  As of June 8, 2007, Plaintiff was a no call/no show for more than three work shifts, and, therefore, Personnel Manager Ms. Joan Gray made the decision to remove her as an employee from Walmart's system at that time. (*Id.*, ¶ III.B.7).

---

[13] The Open Door Policy allows a Store Manager to reverse a decision that is made by an Assistant Manager. (Def. Statement, ¶ III.B.6).  Plaintiff testified at her deposition that she understood that Mr. Rodriguez was Robinson's superior, and pursuant to Walmart's Open Door Policy, he had the power to reverse Robinson's decision to terminate her employment. (*Id.*, ¶ III.B.9).

Plaintiff also relies on several other instances to support her racial harassment claim. Plaintiff testified that Robinson, Carmen Tejeda ("Tejada"), and a co-Associate "Tracy,"[14] would give her shopping carts containing items that needed to be returned to the merchandise shelf and tell her that it would not "hurt her to stay . . . a little past seven" and complete the returns. (*Id.*, ¶ IV.B.1(a)).  On one occasion, Robinson said to Plaintiff, "Well, if you ever need anything, let me know, iighit, iight," which, according to Plaintiff, is slang for "alright."  (*Id.*, ¶ IV.B.1(d)).  Plaintiff did not ask Robinson why she pronounced the word "alright" as "iight" on this one particular occasion, and she relies on her personal belief and assumption in claiming that Robinson used the word "iight" because Plaintiff is African-American.  (*Id.*).  Moreover, Tejeda allegedly:  (1) followed Plaintiff around the store while she shopped; (2) suggested that Plaintiff under-rang merchandise by charging a customer less for her purchase;  and (3) stated that it was Plaintiff's word against Lewis'. (*Id.*, ¶ IV.B.1(g)).  Plaintiff admits that she never reported to any Walmart manager that she believed Ms. Tejeda's conduct was in any way related to her race.[15]  (*Id.*).

Based on the foregoing, Plaintiff filed an Amended Complaint against Walmart alleging: (I) Violations of the Florida Civil Rights Act of 1992 (the "FCRA")*,* Fla. Stat. §

---

[14]

Plaintiff admits that "Tracy" never harassed her on account of her race. (Def. Statement, ¶ IV.B.2).

[15]

Indeed, other than Lewis' alleged use of the "N-word" on one occasion in July 2006, Plaintiff did not hear any other Walmart Associate make any racially related comment to or about her.  (Def. Statement, ¶ IV.B.3).  Moreover, other than Plaintiff's single complaint about Lewis in July 2006, at no time prior to her Open Door discussion with Mr. Rodriguez on May 19, 2007, did Plaintiff notify any member of Management that she had been subjected to any comment or conduct that she believed was related to her race. (*Id.*)

760.01 *et seq.*; and (II) Violation of The Family and Medical Leave Act of 1993 (the "FMLA"), 29 U.S.C. § 2601 *et seq*.  Walmart has moved for summary judgment on all counts.

## II.   Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim.  *See id.*  ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 252; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir. 2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact.  *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).  Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  *Celotex v. Catrett,* 477 U.S. 317, 324 (1986).  A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party.  *Anderson,* 477 U.S. at  248; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  In assessing whether the movant has met its

9

burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party.  *Denney,* 247 F.3d at 1181.

## III.   Discussion

## A.   Plaintiff's Discrimination and Retaliation Claims Under the FCRA

Count I of Plaintiff's Amended Complaint sets forth claims of discrimination based upon race and sex pursuant to the FCRA. The FCRA provides that it is an unlawful employment practice for an employer "to discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status."[16]  *See* Fla. Stat. § 760.10.

To establish a prima facie case of race or sex discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class, or was treated less favorably than a similarly situated person outside the protected class.[17]  *See Jeronimus v. Polk County Opportunity Council, Inc.,* 145 Fed.Appx.

---

[16]

"Because the FCRA is patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), 3(a), courts routinely apply Title VII case law to discrimination claims brought under the FCRA."  *Muggleton v. Univar USA, Inc.*, 249 Fed.Appx. 160 (11th Cir. 2007) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998)).

[17]

Because Plaintiff relied on circumstantial evidence, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), applies to her discrimination claims. Under *McDonnell Douglas*, "if a plaintiff succeeds in carrying the initial burden of establishing a prima facie case of discrimination, the employer must then rebut the presumption of discrimination by

319, 324 (11th Cir. 2005); *see also Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000).

In order to establish an adverse employment action, "a plaintiff must show a serious and material change in the terms, conditions, or privileges of employment[.]" *Hyde v. K.B. Home, Inc.*, 355 Fed.Appx. 266, 269 (11th Cir. 2009) (citing *Davis v. City of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)) (internal quotations omitted).  Specifically, Plaintiff must show that she suffered "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change of benefits." *Burlington Idus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Moreover, "[t]he employee's subjective view of the significance and adversity of the employer's action is not controlling; [rather], the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Hyde v. K.B. Home, Inc.*, 355 Fed.Appx. at 269 (internal quotations and citations omitted).

In the instant case, Walmart argues that Plaintiff cannot establish that she was subjected to an adverse employment action, and, thus, her discrimination claims fail as a matter of law.[18]  In response, Plaintiff contends that she suffered an adverse employment action because on May 19, 2007 Robinson stated that her employment was terminated.  As Defendant correctly notes, however, it is undisputed that after Robinson advised

---

articulating a legitimate, nondiscriminatory reason for the challenged employment action." *Jiles v. United Parcel Service, Inc.*, 2010 WL 27958, *1 (11th Cir. 2010).  Only if the plaintiff does so does the burden shift to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.* Once such a reason is given, the burden shifts back to the plaintiff to demonstrate that the articulated reason is a pretext.  *Id.*

[18]

As explained more fully below, Defendant correctly notes that Plaintiff's inability to establish that she suffered an adverse employment action is also fatal to her FMLA retaliation claim.

Plaintiff on May 19, 2007 that her employment was being terminated, Plaintiff immediately exercised Walmart's Open Door Policy and complained to Store Manager Mr. Rodriguez about her termination.   (Def. Statement, ¶ III.B.5-7).   It is further undisputed that Mr. Rodriguez reversed Robinson's termination decision on the same day; advised Plaintiff to return to work during her next scheduled shift; and when Plaintiff indicated that she did not want to work her next scheduled shift because she needed to attend to some personal issues in Miami, he agreed to allow her to return back to work on her following scheduled shift.   (*See id.* at ¶ III.B.7).   Plaintiff's testimony describing Mr. Rodriguez's response to her Open Door complaint of Robinson makes this clear:

> Ms. Hills:   He said – he said, "Ms. Hills," he said, "you can come back."
> He said -- he said, "You can come back." He said, "Bambi has
> a problem with it, you tell her to call me."
>
> Q:   So he (Mr. Rodriguez) told you that notwithstanding,
> regardless of what Bambi told you, you could still work at Wal-
> Mart, correct?
>
> Q:   Correct?
>
> A :   He said that.
>
> Q:   And he said it the same day that Bambi told you that your
> employment was terminated, correct?
>
> A :   Right. But he said we'll talk about it as well.

[DE 52-4 at p. 29 (objection omitted)].[19]

---

[19]

Plaintiff also testified at the Agency for Work Force Innovation hearing as follows:

Moreover, the uncontroverted record evidence shows that Plaintiff's employment ended after she voluntarily decided not to report to work or properly call in for more than three work shifts.   (Def. Statement ¶ III.B.10).   Indeed, Plaintiff testified during her deposition as follows:

> Q:      And the reason you did not go back to work, as you testified during the unemployment hearing, is you had made the decision you were going to pursue a discrimination claim as opposed to going back to work, correct?
>
> A:      Right. What I talked about to Pedro about, yes, I was continuing with that.
>
> Q:      Okay. What I said is true, correct?
>
> A:      Yes.

[DE 52-6 at p. 276].  The Eleventh Circuit has held that "[n]o adverse employment action occurs when an employer rescinds a decision to take action before the employee suffers tangible harm." *Pennington v. City of Huntsville*, 261 F.3d 1262,1267 (11th Cir. 2001); *see also Hickey v. Columbus Consolidated Government*, 2010 WL 1172535, * 2 (11th Cir. 2010) (decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action).  Accordingly, because the undisputed evidence shows that (1) Plaintiff's Store Manager advised her that she could return to work, and (2) she voluntarily chose not to do so, Plaintiff has failed to establish

---

> Ms. Hills:      ... so [Mr. Rodriguez] says, "Well, do you want to come back?" He said -- he said, "You can come back." He said, "You can come back."  He said, "We'll talk about it." He said, "But I'm already letting you know you can come back."

[DE 52-21 at p. 35].

that she suffered tangible harm in the form of an adverse employment action and summary judgment is warranted on her FCRA  race and sex discrimination claims.[20] *See Johnson v. Wal-Mart Stores, Inc.*, 2000 WL 1005813, *1 n. 1 (S.D. Ala. 2000) (concluding that evidence consisting of excerpts of plaintiffs' deposition testimony was sufficient to satisfy defendant's burden on summary judgment); *see also Gieringer v. Silverman*, 731 F.2d 1272, 1277 (7th Cir. 1984) (affirming grant of summary judgment in favor of defendants based solely upon the plaintiffs' deposition testimony); *Durant v. A.C.S. State & Local Solutions, Inc.*, 460 F. Supp.2d 492, 494-95 (S.D.N.Y.2006) (granting employer summary judgment based on plaintiff's deposition testimony as to two instances of sexual harassment forming the basis for her lawsuit).

Given that Plaintiff has failed to establish that she suffered an adverse employment action, Plaintiff's FCRA retaliation claim must also fail.[21]  To establish a prima facie case

---

[20]

It bears mentioning that Plaintiff has also failed to meet her burden to establish that she was replaced by a person outside the protected class, or was treated less favorably than a similarly situated person outside the protected class.  In an attempt to satisfy this element of her discrimination claims, Plaintiff alleges in her Amended Complaint that she was "subjected to greater scrutiny" and treated "more onerously regarding time-off than similarly-situated male workers, and workers who had not complained about discrimination."  [DE 7, ¶ 6].  Contrary to her allegations, however, Plaintiff has failed to point to any evidence in the record of a similarly situated male associate or associate who had not complained about discrimination being treated more favorably.

[21]

The FCRA, like Title VII, 42 U.S.C. § 2000e-3(a), includes a separate anti-retaliation provision, stating that:

It is an unlawful employment practice for an employer ... to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section.

of retaliation, plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal relation between the protected activity and the adverse action. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir.2008).   "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability." *Id.*   Once the employer makes this showing, "the plaintiff has a full and fair opportunity to demonstrate that the [employer's] proffered reason was merely a pretext to mask discriminatory action."[22] *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).

As set forth above, Plaintiff never suffered any material adverse action by her employer, and, therefore, Plaintiff cannot establish the second and third requisite elements. *Burlington N. & Santa Fe R.R. Co. v. White*, 126 S. Ct. at 2414 ("[Title VII's] antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").   Accordingly, Plaintiff's FCRA retaliation claim fails as a matter of law.[23]

---

Fla. Stat. § 760.10(7).

[22]

To show pretext, the plaintiff must present evidence sufficient "to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse [action]." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997).   Here, Plaintiff has failed to show that the nonretaliatory reason for her separation from the company – her voluntary job abandonment – is a pretext for intentional discrimination and/or retaliation.

[23]

Even assuming that an adverse employment action took place, Plaintiff is unable to establish a causal connection between her alleged protected activity in July 2006 and her separation from Walmart nearly a year later in June 2007.   For this reason also Plaintiff's FCRA retaliation claim must fail.   *See e.g. Nichols v. CSG Sys.*, 245 Fed. Appx. 937, 941

**B.     Plaintiff's FMLA Retaliation Claim**

The FMLA requires employers to provide "eligible employees" with up to twelve weeks of unpaid leave.  29 U.S.C. § 2611.  An "eligible employee" is an employee who has worked for the employer for twelve months and for at least 1,250 hours in the preceding year. *Id.*  The Act prohibits an employer from retaliating against an employee who attempts to exercise any FMLA-created right.[24] 29 U.S.C. § 2615(a);  *Walker v. Elmore County Bd. of Educ.*, 379 F.3d 1249, 1250 (11th Cir. 2004).

"A prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two. *Krutzig v. Pulte Home Corp.*, --- F.3d ----, 2010 WL 1267238, *2 (11th Cir. 2010) (citing *Smith v. BellSouth Telecomm., Inc.*, 273 F.3d 1303, 1314 (11th Cir.2001)). The causal connection element

---

(11th Cir. 2007) (holding that there was no causal connection where there was nearly a ten month span between plaintiff's statutorily protected activity and the adverse action); *see also Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected expression and the adverse action, in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.").

[24]

Like Plaintiff's FCRA claim discussed *supra*, where a plaintiff does not present any direct evidence of retaliatory discharge in violation of the FMLA, circumstantial evidence may be evaluated under the burden shifting framework articulated in *McDonnel Douglas*.  *See Raspanti v. Four Amigos Travel, Inc.,* 266 Fed. Appx. 820, 822 (11th Cir. 2008).  Under this framework, the employee bears the burden of establishing a prima facie case of retaliation. *Id.*  Once the employee has met that burden, it then shifts to the employer "to articulate a legitimate reason for [any] adverse action."  *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008).  If the employer does so, the employee must show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Hulber v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286,1298 (11th Cir. 2006) (internal quotations omitted).

is satisfied if a plaintiff shows that the protected activity and adverse action were "not wholly unrelated." *Id.* A plaintiff can demonstrate the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action. *Id.*

Plaintiff's FMLA retaliation claim fails for several reasons. First, even assuming Plaintiff is FMLA eligible, which as explained below is not the case, Plaintiff cannot demonstrate that she suffered tangible harm in the form of an adverse employment action. As set forth above, although Plaintiff argues that she suffered an adverse employment action because her employment was terminated on May 19, 2010, it is undisputed that Store Manager Mr. Rodriguez reversed Plaintiff's termination and directed Plaintiff to return to work on the very same day. (Def. Statement, ¶ III.B.5-7). For this reason, Plaintiff cannot meet her burden to establish a prima facie case of retaliation under the FMLA, and thus, summary judgment is warranted.[25]

Plaintiff's FMLA retaliation claim must also fail because Plaintiff was not FMLA eligible at the time she was allegedly retaliated against for taking FMLA protected leave. In her Amended Complaint, Plaintiff alleges that "defendant discriminated and retaliated against Plaintiff for using family medical leave [in 2007]... for treatment of a serious health

---

[25] To be sure, even if Plaintiff had established a prima facie case of retaliation, she has failed to proffer evidence that Walmart's articulated reason for her separation from the company – the voluntary abandonment of her employment with Walmart – was a pretext for retaliation. Indeed, Plaintiff failed to rebut Walmart's evidence showing that Plaintiff was repeatedly treated leniently in light of her poor attendance throughout her employment. Plaintiff even acknowledge at her deposition that in January 2007, after she had already complained about racial harassment, she could have been terminated under Walmart's Attendance and Punctuality Policy on account of her poor attendance. (Def. Statement, ¶ II.B.7).

condition, her high risk pregnancy, that resulted in a miscarriage." [*See* DE 7-1 ¶¶ 6, 13-16]. According to Plaintiff, she learned of her "high risk pregnancy" on either April 29 or 30, 2007. [*See* DE 52-4 at p. 26; DE 52-6 at p. 48]. Therefore, Plaintiff's FMLA retaliation claim is based on the allegation that Walmart retaliated against her for having taken FMLA protected leave at some point after April 29, 2007. The uncontroverted evidence of record shows, however, that Plaintiff was not FMLA eligible as of April 29, 2007, or at any point in time thereafter. This is because Plaintiff failed to work at least 1,250 hours in the preceding 12 months. (Def. Statement, ¶ III.A.4.). Notwithstanding the evidence of record, in an attempt to create a genuine issue of material fact, Plaintiff relies on misleading calculations to argue that Plaintiff worked the required number of hours prior to April 29, 2007. [*See* DE 67, Ex. 4 of Pl. Statement]. To this end, Plaintiff's calculations inappropriately include hours for which Plaintiff received pay but did not work, i.e., vacation, holiday, sick, and other unworked hours. In calculating the "hours of service," the FMLA incorporates by reference the legal standards of the Fair Labor Standards Act (FLSA). *See* 29 U.S.C. § 2611(2)(C). Under the FLSA, only hours that are actually worked count towards an employee's "hours of service" requirement. 29 U.S.C. § 207(e)(2). The FLSA implementing regulations clarify that "periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked." 29 C.F.R. § 785.16(a)*; see also Jeffries v. School Bd. of Collier County,* Fla., 2007 WL 2904140, * 2 (M.D. Fla. 2007)*; Moore v. Sears Roebuck & Co.*, 2007 WL 1950405, *4 (N.D. Fla. 2007) ("The FLSA provides that vacation, holiday pay, sick leave, and other pay for hours not actually worked do not count towards the 1,250 hours requirement."); *Plumley v. Southern Container, Inc.*, 303 F.3d 364, 372

18

(1st Cir. 2002) ("[W]e hold that hours of service, as those words are used in the FMLA, include only those hours actually worked in the service and at the gain of the employer.").

In the instant case, a proper calculation of the hours actually worked by Plaintiff reveals that she cannot meet the requisite 1,250 hours as of the date Plaintiff learned of her high risk pregnancy, either April 29 or 30, 2007.  Indeed, she worked a total of 938.15 and 933.55 hours, respectively, in the preceding 12-month period.  Given that Plaintiff was not FMLA-eligible during her 2007 pregnancy, it is undisputed that Plaintiff did not engage in FMLA-protected activity on account of her absences.  Accordingly, to the extent Plaintiff's FMLA claim is based on her 2007 pregnancy, it must fail as a matter of law.[26]  *See Walker*, 379 F.3d at 1253 (Eleventh Circuit affirming summary judgment for employer where the employee who was not FMLA-eligible asserted an FMLA retaliation claim, holding that the statute does not protect an attempt to exercise a right that is not provided by FMLA, i.e., the right to leave before one becomes eligible therefore).

---

[26]

Moreover, completely ignoring the factual allegations of her Amended Complaint, Plaintiff now claims an FMLA interference claim, and for the first time, she claims her FMLA retaliation claim is premised on her allegedly taking FMLA-protected leave in December 2006 in connection with her attempts to avoid the State of Florida extinguishing her parental rights and her alleged ovarian cyst and migraines. (*See* Pl.'s Opposition at pp. 17-18). It is well-settled in the Eleventh Circuit, however, that a party may not raise new claims or theories when responding to a motion for summary judgment. *See e.g. Gilmour v. Gates. McDonald and Co.*, 382 F.3d 1312 (11th Cir. 2004); *Hurlbert*, 439 F.3d at 1286; *Mahgoub v. Miami Dade Community College*, 2006 WL 952278, *2 n. 3 (11th Cir. 2006). Plaintiff's Amended Complaint does not assert an FMLA interference claim or otherwise provide any information that would place Walmart on notice of such a claim. Indeed, all of her allegations refer to her "using" and "taking" FMLA leave, not being "interfere[d] with, restrain[ed], or den[ied]" the ability to exercise FMLA rights. (*See generally* Pl.'s Amended Complaint; *see also* 29 U.S.C. §§ 2615(a)(1)).  Accordingly, Plaintiff failed to perfect an FMLA interference claim, and her attempt to amend her Complaint to assert such a claim by way of her Opposition [DE 70] must be rejected.

Moreover, to the extent Plaintiff argues that her FMLA retaliation claim is premised on her allegedly taking FMLA-protected leave in December 2006 and January 2007 this argument is unavailing. This is because Plaintiff was not FMLA eligible at the time that she claims she was on leave on account of her attempt to avoid losing her parental rights over her children and/or when she claims she suffered an ovarian cyst and migraines.  In support of this argument, Plaintiff points to a summary which purportedly indicates that Plaintiff worked in excess of 1,250 hours as of December 2006. [*See* DE 67 Ex. 4 Pl. Statement].   Nevertheless, a review of the underlying time records which support the summary makes clear that, contrary to Plaintiff's assertion, she did not work the minimum 1,250 hours as of December 2006 to be FMLA eligible.  Instead, her actual hours worked in December 2006 were between1075.9 and 1097.25 hours.[27]    [DE 52-20; *see also* Plaintiff's Timeclock Archive Report Bates Nos. 1893-1895].  Accordingly, Plaintiff has failed to establish that she was FMLA eligible at any arguable relevant point in time.  *See Walker*, 379 F.3d at 1253.

In an attempt to salvage her FMLA retaliation claim, Plaintiff argues that "[a]n employer may be estopped from denying leave to an ineligible employee after mistakenly notifying the employee he or she was eligible for FMLA leave."[28]   [*See* DE 70-1, p. 16

---

[27]

Additionally, Plaintiff's bald assertion that Walmart's time records are inaccurate must be rejected, as this claim was never raised in her Amended Complaint. *See e.g. Gilmour*, 382 F.3d at 1315; *Hurlbert*, 439 F.3d at 1297; *Mahgoub*, 2006 WL 952278 (11th Cir. 2006).

[28]

 "To invoke estoppel, a party must prove that: (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not

(citing *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706 (2d Cir. 2001) (employer's silence about an employee's eligibility for FMLA leave, in the face of the employee's announcement of intent to take such leave, amounted to a misrepresentation upon which equitable estoppel could be based)].  As an initial matter, I note that Plaintiff fails to point to any Eleventh Circuit precedent whatsoever in support of this legal contention.  *See Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1266 (11th Cir. 2008) (recognizing that the Eleventh Circuit has not yet adopted the estoppel doctrine in the FMLA context).  Even assuming such precedent existed, as Walmart correctly notes, the record lacks support for the assertion that Plaintiff took FMLA protected leave in December 2006 and January 2007; nor does the record support the allegation that Walmart made material representations with regard to Plaintiff's eligibility under the FMLA during the relevant time periods.  Indeed, Plaintiff fails to point to any evidence indicating that Walmart approved Plaintiff for medical leave in January 2007. [*See* DE 52-26 (granting *personal leave* in January 2007)].  This is because time spent by an employee in court trying to avoid having his or her rights extinguished by the State of Florida is not protected by the FMLA.  *See* 29 U.S.C. § 2612; *Gray v. Vestavia Hills Bd. of Educ.*, 317 Fed.Appx. 898 (11th Cir. 2008) ("The FMLA entitles an eligible employee to take up to 12 weeks of leave in a 12-month period for the birth or adoption of a child, or the serious health condition of the employee or the employee's child, spouse, or parent.") (citing 29 U.S.C. § 2612(a)(1)).  Moreover, the instant record is devoid of any competent evidence to support

---

know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation."  *Martin v. Brevard County Pub. Schools*, 543 F.3d 1261, 1266 n. 2 (11th Cir. 2008) (internal quotations and citations omitted).

the notion that Plaintiff's alleged ovarian cyst and/or migraines constitute a "serious health condition" under the FMLA. *See Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir.1999) ("Whether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so."). Accordingly, no reasonable factfinder could conclude from the evidence that Walmart misrepresented to Plaintiff that she was entitled to FMLA leave in December 2006 and January 2007, and, therefore, Plaintiff has failed to raise a genuine issue of fact as to whether estoppel applies to the present case.

**C.    Plaintiff's Racial Harassment Claim**

To establish a racial harassment claim under the FCRA, a plaintiff must establish that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon a protected classification; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a hostile working environment. *Mosley v. MeriStar Mgmt. Co., LLC,* 137 Fed.Appx. 248, 251 (11th Cir. 2005) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). In determining whether alleged conduct is sufficiently "severe or pervasive," courts evaluate: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Freeman v. City of Riverdale*, 330 Fed. Appx. 863 (11th Cir. 2009). It is not enough that the plaintiff subjectively perceived the working climate as hostile; the harassment must be such that a reasonable person in the plaintiff's position would find that the harassing conduct materially altered the working environment. *See*

22

*Edwards v. Wallace Comm. College*, 49 F.3d 1517, 1521 (11th Cir.1995).

Here, Plaintiff is unable to show that she was subjected to severe or pervasive harassment on account of her race.   During her deposition, Plaintiff testified that her racial harassment claim is premised on the following comments and/or incidents: (1) Customer Service Manager Lewis allegedly uttered the "N-word" on one occasion in July 2006; (2) on one occasion in July 2006, after asking Plaintiff to return to her register because the lines of customers increased, Lewis allegedly clapped her hands at Plaintiff and said, "Hey, hey, hey, hey. What did I tell you? You see the line. Look, you're not paying attention to what I told you."; (3) Assistant Manager Robinson allegedly pronounced the word "alright" as "iight" on one occasion; (4) Robinson, Customer Service Manager Tejeda, and one of Plaintiff's co-associates, "Tracy," allegedly told Plaintiff to return certain merchandise to the merchandise shelves, and allegedly also told her that it would not hurt her to stay past 7:00 to ensure that the items were returned; (5) Tejeda allegedly: (a) followed Plaintiff around the store while she shopped; (b) suggested that Plaintiff under-rang merchandise by charging a customer less for her purchase; and (c) allegedly stated that it was Plaintiff's word against Lewis' as to whether Lewis ever uttered the "N-word;" and (6) Lewis allegedly removed a sticker that Plaintiff placed on Lewis's daughter's hand and then wiped her daughter's hand where the sticker had been placed.   Although, undoubtedly, Plaintiff may have perceived these incidents or utterances as offensive, with the exception of Plaintiff's claim that Lewis uttered the "N-word" on one occasion in July 2006, Plaintiff's allegations in support of her harassment claim cannot objectively be construed as racially-related. Indeed, Plaintiff admits that the only racially related remark she heard at Walmart was Lewis's use of the "N-word" on one occasion in July 2006.  (Def. Statement, ¶ IV.B.3).  As

the Supreme Court has stated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1997) (citation omitted).  Accordingly, these incidents are insufficient to create a genuine issue of material fact as to whether the alleged harassment was sufficiently severe or pervasive so as to alter the terms and conditions of Plaintiff's employment, and Walmart is entitled to summary judgment on this claim.  *See, e.g., Casanova v. Pre Solutions, Inc.*, 2006 WL 5451193, *12-4 (N.D. Ga. 2006) (finding no hostile work environment where supervisor frequently referred to employee as "Carlos" and "Julio," once stated, "were you guys having some sort of fiesta at the Company's expense?", "you people can't add," and once called employee a "fat wetback" in front of other employees).

## IV.   Conclusion

In light of all of the foregoing, I conclude that *Plaintiff* has failed to raise any genuine issues of material fact to preclude summary judgment.  Viewing the undisputed facts in the light most favorable to Plaintiff, Defendant is entitled to judgment as a matter of law.  Accordingly, it is hereby

**ORDERED and ADJUDGED** that:

1. Walmart's Motion for Summary Judgment **[DE 51] is GRANTED**.

2. This case is CLOSED.

3. All pending motions are DENIED as MOOT.

DONE and ORDERED in Chambers in Miami, Florida, this 6th day of May, 2010.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
All counsel of record
U.S. Magistrate Judge Chris M. McAliley